**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

TREY GOODMAN,                                    :
                                                 :
            Plaintiff,                           :
                                                 :
      VS.                                        :
                                                 :        **5 : 14-CV-340 (MTT)**
                                                 :
CURTIS CARTER,                                   :
                                                 :
            Defendant.                           :
_____                  :

## ORDER and RECOMMENDATION

The Plaintiff filed this action pursuant to 42 U.S.C. § 1983 in September 2014 raising allegations of excessive force.   (Doc. 1).   Presently pending herein are the Defendant's Motion for Summary Judgment, Plaintiff's Motion for an Evidentiary Hearing, and Plaintiff's Motion for Default Judgment.   (Docs. 17, 23, 28).   The Clerk of Court notified the Plaintiff of the filing of the Defendant's Motion for Summary Judgment, advised him of his obligations under the law, and directed him to respond thereto within thirty (30) days of the date of the notification.   (Doc. 20).   The Plaintiff has responded to the Defendant's motion.   (Docs. 24, 26, 27).

### Background

Plaintiff's claims arise out of events occurring during his incarceration at Georgia Diagnostic and Classification State Prison in October 2013.   By Order dated January 13, 2015, the Court allowed Plaintiff's excessive force claims against Defendant Carter to proceed.   (Doc. 8).   In his Complaint, Plaintiff alleges that on October 15, 2013,

following an inspection, he asked an officer if he could speak to Deputy Warden Eutsey. The CERT team entered the area, and Defendant Carter and another CERT team member rushed toward Plaintiff, grabbed him, and Plaintiff dropped to the ground.   Officer Carter allegedly choked Plaintiff while another officer held Plaintiff's left arm behind his back. Plaintiff was eventually handcuffed and shackled at the ankles.   Defendant Carter picked Plaintiff up by the back of his pants, causing pain in his testicles.   Plaintiff attempted to adjust his pants to alleviate the pain, and Defendant Carter began to push and pull Plaintiff, causing Plaintiff to go "head first into the beam connected to the window".   (Doc. 1). Plaintiff was taken to the medical department and treated for his injuries, which included receiving stitches for a laceration on his forehead and ointment application for an abrasion on his shoulder.   (Doc. 24-1).

## Evidentiary Hearing

In a motion filed on August 17, 2015, Plaintiff seeks an evidentiary hearing so that "all evidence [can be] examined by judge and both parties before court moves to a decision."   (Doc. 23).   Defendant has verified that Plaintiff was able to view the video evidence submitted by Defendant herein, and Plaintiff indicates that he has reviewed video evidence.   (Docs. 25, 26).   Thus, Plaintiff's Motion for Evidentiary hearing has been rendered moot and is accordingly **DENIED**.

## Motion for Default Judgment

In a motion filed by Plaintiff seeking the entry of default judgment, Plaintiff asserts that he is entitled to judgment based on Defendant Carter's alleged failure to respond to

Plaintiff's "last summary judgment attachment".   (Doc. 28).   "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).   The entry of default or default judgment, however, is not appropriate in this case, as Defendant Carter has not failed to plead or otherwise defend this action.   A response from Defendant Carter was not required regarding Plaintiff's "last summary judgment attachment", although the Court notes that Defendant Carter did in fact file a reply to Plaintiff's response to Defendant's summary judgment motion.   (Doc. 25). Accordingly, it is the recommendation of the undersigned that Plaintiff's Motion for Default Judgment be **DENIED**.

## Motion for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1).

As the party moving for summary judgment, the Defendant has the initial burden to

demonstrate that no genuine issue of material fact remains in this case.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).   The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record, including pleadings, discovery materials, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.   "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials 'including the facts considered undisputed' show that the movant is entitled to it".   Fed.R.Civ.P. 56(e)(3).   The Defendant has supported his Motion for Summary Judgment with Plaintiff's deposition testimony, the affidavit of Correctional Officer Michael Stovall, the Defendant's affidavit, and video evidence of the use of force incident. (Doc. 17).

The Eighth Amendment forbids cruel and unusual punishment, and this prohibition governs "the treatment a prisoner receives in prison and conditions under which he is confined." *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003).   "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*,

503 U.S. 1, 5 (1992).   In analyzing an excessive force claim, courts consider "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted", as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321.   "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. "   *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1500 (11th Cir. 1985) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989).

The Supreme Court has clarified that "[t]he 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). Although the extent of any injury is not alone dispositive of an excessive force case, it is "one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation."   *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

In arguing that he is entitled to the entry of summary judgment in regard to the Plaintiff's claim of excessive force, the Defendant has submitted his affidavit, Correctional Officer Michael Stovall's affidavit, Plaintiff's deposition, and video evidence of the

incident.   Defendant Carter states in his affidavit testimony that he was a Lieutenant on the CERT team at Georgia Diagnostic and Classification State prison on October 15, 2013, and was one of the officers involved in the use of force against Plaintiff on that date.   (Doc. 17-5, ¶ 2).   Upon arriving in Plaintiff's dorm, Defendant Carter was informed that Plaintiff was refusing to be cuffed.   *Id.* at ¶ 3.   Defendant Carter instructed Plaintiff to turn around and cuff up, but Plaintiff refused to do so, and asked to speak with Deputy Warden Eutsey.   *Id.* at ¶ 4.   Defendant Carter and another officer placed Plaintiff on the ground, and Plaintiff kept one arm underneath his body.   *Id.* at ¶¶ 5, 6.   Plaintiff refused to bring his arms together to be cuffed, despite repeated orders from Defendant Carter and another officer to cease resisting.   *Id.* at ¶¶ 6, 7.   Ultimately, Defendant Carter and another officer placed handcuffs and leg restraints on Plaintiff, and Defendant Carter states that "[n]o force was used in this incident other than the force that was required to place Inmate Goodman's hands in the restraints and gain positive control over him.   No force was used after Inmate Goodman was placed in arm and leg restraints." *Id.* at ¶¶ 7, 8.

Defendant Carter further states that

> [n]either Officer Stovall nor I choked or punched Inmate
> Goodman.   I did not intend to harm Inmate Goodman.
> Instead, my sole intent was to bring Inmate Goodman's arms
> around his back so that he could be restrained and to gain
> positive control of Inmate Goodman using the least amount of
> force possible. . . [W]e repeatedly told him to stop resisting.
> Once Inmate Goodman was restrained, I placed one hand
> around his left arm and placed my other hand near the belt loop
> on his pants for support, and I brought him up off of the
> ground.   I did not intentionally yank Inmate Goodman's pants
> up for the purpose of hurting him.   Instead, I was only trying

6

> to pick him up off of the ground, and that was the best way for
> me to do so.   I then began to escort Inmate Goodman toward
> the exit of Dorm K-3.   However, Inmate Goodman
> immediately lunged forward and tried to snatch himself away
> from me.   I was not expecting Inmate Goodman to do this and
> was caught off balance.   Plaintiff's momentum in lunging
> forward carried him into the glass partition of the entrance to
> Dorm K-3.   I did not intentionally push Inmate Goodman into
> the partition.

*Id.* at ¶¶ 9-13.

Michael Stovall was a Correctional Officer who was also involved in the use of force against Plaintiff on October 15, 2013, and he testifies in his affidavit that Plaintiff was sleeping and not ready for inspection on that date, and that Plaintiff refused to get out of bed.   (Doc. 17-4, ¶¶ 2, 5-6).   Plaintiff was instructed to pack his belongings to be moved to administrative segregation.   *Id.* at ¶¶ 6-7.   Plaintiff did not comply, and Officer Stovall instructed Plaintiff to place his hands behind his back to be cuffed.   Plaintiff again refused, and insisted on talking with Deputy Warden Eutsey.   *Id.* at ¶ 8.   Stovall called for Defendant Carter and another member of the CERT team, and when Defendant Carter arrived, Stovall told him that Inmate Goodman was refusing to comply with Deputy Warden Eutsey's order that he be locked down in administrative segregation.   *Id.* at ¶¶ 9-10.   Officer Stovall's further recounting of the events that followed supports Defendant Carter's description of the circumstances surrounding Plaintiff's removal from Dorm K-3. *Id.* at ¶¶ 11-21.

The video evidence submitted by Defendant Carter, which does not include an audio

recording, shows the use of force incident from two (2) different camera locations and perspectives.   (Doc. 17-7).   The first perspective only shows Plaintiff being escorted from the dorm area by Defendant Carter and hitting the window area, and the second perspective shows the Plaintiff apparently talking with correctional officers, being placed on the ground by officers, some degree of struggle between Plaintiff and the officers, and ultimately Plaintiff being escorted out of the area and hitting a wall or window.

In Plaintiff's deposition testimony, Plaintiff testifies that he was ready for inspection on October 15, 2013, and that an unidentified violation resulted in the inspecting warden telling Plaintiff to pack his belongings to be moved to administrative segregation, saying "find him somewhere else to live." (Doc. 17-3, p. 12).   Plaintiff needed additional bags in which to pack, and sought to speak to the warden.   *Id.* at p. 13.   The CERT team intervened and "grabbed" Plaintiff.   *Id.*   Plaintiff maintains that Officer Stovall did not instruct Plaintiff to "cuff up", but only told the CERT team that Plaintiff refused to be cuffed.   *Id.* at p. 14.   Plaintiff told the CERT team that the "only thing I asked was to talk to the warden, to let them know what going on."   *Id.*   Plaintiff admits that his right arm remained underneath him once he was placed on the ground.   *Id.*   He felt someone hit him and try to choke him.   "[A]fter a while, . . . I guess he kind of maneuvered above my back and then my other arm came.   Then that's when they put the handcuffs on me."   *Id.* Plaintiff testified that he knew Defendant Carter was behind him during this altercation, and that "the whole time they be trying to grab [his arm]."   *Id.* at p. 15.

After he was handcuffed, Plaintiff maintains that Defendant Carter lifted Plaintiff off

the ground by his belt or the back of his pants.   *Id.* at p. 17.   Plaintiff tried to readjust his

pants, took a couple of steps, and Defendant Carter "grabbed my pants and try to lift them

up one more time."   *Id.*   Plaintiff then

> grab my pants, back of my pants, because my hand was
> handcuffed behind my back, and I grabbed the back of my
> pants so he can't lift them all the way up.   And then, . . . that's
> when he got to pushing and pulling, like grabbing back of my
> shirt and pushing me. . . [H]e wanted to just show like his
> machoness [sic] and try to like lift you up out your pants and I
> hold you up in the air type stuff.   And . . . that's not what I let
> him do.   I grab the back of my pants.
>
> . . .
>
> But he try and pull up so hard, I had to like try to pull down,
> like to resist, and then like hold it down so he couldn't just
> keep pulling my pants all the way up.

    *Id.* at pp. 17, 18.

Plaintiff describes Defendant Carter pushing and pulling him towards the exit door, pulling

Plaintiff back prior to Plaintiff hitting a sink.   Afterward

> he [Defendant Carter] pushed me forward again after that. . . .
> Because I had caught myself and pushed back.   Then I seen
> like . . . like push my weight off, because the weight going
> directly that way, so I try like just stomp and push my weight
> off so I don't bust my head on that. . . . [H]e had the last push is
> like a run, and he just pushed me head first into the beam.

    *Id.* at p. 18.

    Other than a one-paragraph affidavit, Plaintiff's responses to Defendant's summary

judgment motion and in support of his allegations in general are unsworn reiterations of his

initial claims.   (Docs. 24, 26, 27).   Plaintiff does attach a use of force report and a medical record reflecting his treatment for injuries following the use of force.   (Doc. 24-1, pp. 1-2).

In his deposition and affidavit testimony, the Plaintiff's recitation of the pertinent facts generally does not conflict with that of Defendant Carter, with the exception of the following allegations:   Plaintiff maintains that Defendant Carter struck Plaintiff and attempted to choke him prior to Plaintiff being handcuffed, and that Defendant Carter pulled Plaintiff's pants up and pushed him into the window frame intentionally to cause Plaintiff harm.

Viewing the facts in the light most favorable to the Plaintiff as the non-moving party, the evidence shows that Plaintiff was instructed to pack his things to be moved to administrative segregation after a negative inspection finding.   Plaintiff continued to ask to speak to the deputy warden.   Once the CERT team officers, including Defendant Carter, arrived, they were told by other officers that Plaintiff refused to be handcuffed. Plaintiff continued to ask to speak to the Deputy Warden, and the CERT team placed Plaintiff on the ground.   One of Plaintiff's arms remained under Plaintiff, and he did not produce this arm for handcuffing to take place.   In an effort to gain control of the situation, Defendant Carter and the other officers used force against Plaintiff to remove his arm from underneath his body, and eventually handcuffed Plaintiff.   Defendant Carter then lifted Plaintiff off of the ground using the back area of Plaintiff's pants.   Plaintiff pulled against this hold, and Defendant Carter pulled back.   Plaintiff ended up hitting the window area, cutting his forehead area and requiring stitches.

10

Significant portions of the affidavit testimony of Defendant Carter are corroborated by the video evidence he has submitted, and no portion of his affidavit appears to be refuted by the video evidence.   Officer Stovall's affidavit testimony establishes, and the Plaintiff does not refute, that the video depicts the Plaintiff and the Defendant and other officers during the incident underlying this lawsuit.   (Doc. 17-4, ¶ 22).   Although containing only visual images with no audio component, the video does show the inmate identified as the Plaintiff in a conversation with officers in his dorm area.   The video evidence also establishes that the Plaintiff is not moving towards segregation with his belongings, but is engaging in a discussion with the officers.   *Id.*   The video shows that the Plaintiff was placed on the ground, and that a struggle ensued as two officers appear to be trying to handcuff Plaintiff.   After being cuffed, Plaintiff was taken away from the area, and Plaintiff and the officer appear to push and pull against each other.   *Id.*   The video also shows that certain inmates were out of their cells during this period of time.   *Id.* Although the video does not clearly show that Plaintiff was hit or struck by the officers, the video footage does not rule out the possibility that Plaintiff was struck by Defendant Carter.   "[W]hen uncontroverted video evidence is available, the court should view the facts in the light depicted by the video recording."   *Mathis v. Adams*, 577 F. A'ppx 966, 968 (11th Cir. 2014).   However, for purposes of summary judgment, the Court should not credit the Defendant's version of the facts over Plaintiff's on "issues not depicted by video evidence."   *Id.*   "While the video evidence may have made [Plaintiff's version of events] less likely, . . . it did not 'so utterly discredit' [his allegations] 'that no reasonable jury

11

could have believed [it]'." *Id.*, *quoting Scott v. Harris*, 550 U.S. 372, 380 (2007).

In regard to the first use of force factor to be considered, the need for the use of force was established by Plaintiff's refusal to comply with Defendant Carter's orders, and his subsequent physical resistance to Defendant Carter's attempts to control his movements towards the exit.   As in *Sanchez v. McCray*, 349 F. A'ppx 479 (11th Cir. 2009), it is clear from Plaintiff's deposition testimony that Defendant Carter was told Plaintiff refused to comply with orders to be handcuffed, and further, that Plaintiff refused to cease resisting and bring his arms together for handcuffing.   Defendant Carter's subsequent use of force "in order to gain control of [the inmate] and force him to comply with [his] orders" is not excessive force.   Plaintiff continued to ask to speak with the Deputy Warden rather than turning to be handcuffed, and once cuffed, physically resisted Defendant Carter's hold on him.   "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding."   *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990).   "And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders."   *Id.*   Thus, the need for the use of force, the first factor to be considered in the excessive force analysis, was established "by the undisputed evidence that [the inmate] created a disturbance." *Bennett*, 898 F.2d at 1533.

The second factor to be considered, the relationship between the need for force and the amount of force used, weighs against a finding of a constitutional violation, as Plaintiff

had clearly not stopped resisting Defendant Carter's efforts to control him, as he continued

to not allow himself to be handcuffed, and physically pulled against Defendant Carter's

efforts to control him as they walked towards the exit. *Cf. Danley v. Allen*, 540 F.3d

1298,1309 (11th Cir. 2008), *overruled on other grounds as recognized in Randall v. Scott,*

610 F.3d 1298, 1307 (11th Cir. 2008) ("Once a prisoner has stopped resisting there is no

longer a need for force, so the use of force thereafter is disproportionate to the need.").

Plaintiff does not dispute that he did not present his arm for handcuffing, and that he pulled

against Defendant Carter's efforts to move him to the exit.

Any factual disputes involving the use of force do not create a reasonable inference

that Defendant Carter acted maliciously and sadistically to cause harm.   When analyzed

against the continued need for force, in the form of the Plaintiff's continued refusal to be

handcuffed and continued physical resistance to Defendant Carter's control, Defendant

Carter's use of force was justified.   Under Plaintiff's version of events, a reasonable jury

could not conclude that the amount of force Defendant Carter used was not reasonably

proportionate to the need for that force.

In regard to the third factor concerning resulting injury, Plaintiff contends that he

suffered a laceration to his forehead that required stitches, an abrasion to his shoulder, a

scratch on his lower back, and pain in his testicles.   The Use of Force Assessment

confirms these injuries as reported. (Docs. 24-1, pp. 1-2).   Plaintiff received

approximately ten (10) stitches for his forehead laceration.   (Doc. 24-1, p. 2.)

"The extent of injury may also provide some indication of the amount of force

applied. . .   The Eleventh Circuit has repeatedly held that a push or shove that causes pain and necessitates no or merely minor medical treatment is not a constitutional violation, even where the prisoner was restrained and no further force was necessary."   *Hall v. Leavins*, 2009 WL 2905912 *4 (N.D.Fla. Sept. 4, 2009) *citing Jones v. City of Dothan*, 121 F.3d 1456, 1460-61 (11th Cir. 1997).   The uncontradicted facts taken in the light most favorable to the Plaintiff herein show that Plaintiff received a significant laceration to his forehead that required stitches as a result of his confrontation with Defendant Carter, and that the use of force therefore resulted in a more than *de minimis* injury. *See Hudson*, 503 U.S. at 9 (blows which caused bruises, swelling, loosened teeth, and a cracked dental plate were not *de minimis*); *McReynolds v. Alabama Dept. of Youth Services*, 204 F. A'ppx 819, 822 (11th Cir. 2006)(laceration requiring eleven stitches was not a *de minimis* injury); *cf. Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (defendant's actions caused only minor bruising which quickly disappeared without treatment and was therefore only *de minimis*).

However, "[w]hile a lack of serious injury is relevant to the inquiry, '[i]njury and force . . . are only imperfectly correlated and it is the latter that ultimately counts.'"   *Smith v. Sec'y., Dept. of Corrections*, 524 F. A'ppx 511, 513 (11th Cir. 2013), *quoting Wilkins*, 559 U.S. at 38.

The fourth use of force factor weighs against finding a constitutional violation, as the extent of the threat reasonably perceived by Defendant Carter on the basis of facts known to him, including an inmate refusing to comply with orders, offering what appears

14

to be physical resistance, and other inmates having been out of or able to exit their cells, would reasonably permit the use of some force in response.   Both Defendant Carter and Officer Stovall testify in their affidavits that Plaintiff's resistance created a threat to the safety of the officers and other inmates in the area, noting that the incident occurred in an open dorm with approximately 20 inmates present.   (Doc. 17-5, ¶ 16; Doc. 17-4, ¶ 21). Plaintiff has not refuted this testimony.

Fifth and finally, Defendant Carter's actions evidence an attempt to temper the use of force response, as he only used the amount of force necessary to gain control of Plaintiff and move him from the area.   *Nasseri v. City of Athens*, 373 F. A'ppx 15, 20 (11th Cir. 2010).   Guards are "permitted to use some force in controlling the situation and preventing it from escalating."   *Id.*

As in *Vicks v. Knight*, 380 F. A'ppx 847 (11th Cir. 2010), where that plaintiff presented no evidence of excessive force beyond his own affidavit, this Plaintiff has presented no evidence beyond his bare assertions to establish that Defendant Carter used force maliciously and sadistically for the very purpose of causing harm.   *Vicks*, 380 F. A'ppx at 852.   Defendant Carter's version of events is corroborated by Officer Stovall, who attests that Plaintiff refused repeated orders to cease resisting and that no force was used other than what was necessary to gain control of Plaintiff, and that Plaintiff continued pulling against Defendant Carter as they moved towards the exit.   Neither Defendant Carter nor Officer Stovall used threatening or abusive language towards Plaintiff.   (Doc. 17-4, ¶ 17; Doc. 17-5, ¶ 11).   *See Mixon v. Mosley*, 2009 WL 1116617 (M.D.Ala. 2009)

15

(force applied without use of threatening or abusive language, supporting conclusion that defendants lacked malicious or sadistic intent).

## Conclusion

Inasmuch as the Plaintiff has failed to sufficiently rebut the Defendant's summary judgment showing regarding Plaintiff's excessive force claims, it is the recommendation of the undersigned that Defendant's Motion for Summary Judgment be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, WITHIN FOURTEEN (14) DAYS after being served with a copy thereof. The District Judge shall make a de novo determination as to those portions of the Recommendation to which objection is made; all other portions of the Recommendation may be reviewed by the District Judge for clear error.

The parties are hereby notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of

16

justice."

  **SO ORDERED and RECOMMENDED**, this 6th day of January, 2016.

        *s/ THOMAS Q. LANGSTAFF*
        **UNITED STATES MAGISTRATE JUDGE**

asb